**Vladimir A. WAPENSKY, Donald Hillman, Theodore Sieler, Rex Golobic, and Harry Wells, not in their individual capacities, but as Trustees of the BPAA Group Insurance Trust, an Illinois Trust, Plaintiffs,**

v.

**JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, a Massachusetts Corporation, Defendant.**

**No. 89 C 9106.**

United States District Court, N.D. Illinois, E.D.

Sept. 25, 1991.

Nicholas D. Chabraja, Susan B. Cohen, Andrew J. Zahaykevich, Jenner & Block, Chicago, Ill., for plaintiffs.

J. Robert Geiman, David J. Novotny, Peterson & Ross, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Vladimir A. Wapensky ("Wapensky"), Donald Hillman ("Hillman"), Theodore Sieler ("Sieler"), Rex Golobic ("Golobic") and Harry Wells ("Wells") (collectively "Trustees"), as Trustees of the Bowling Proprietors' Association of America, Inc. ("BPAA") Group Insurance Trust (the "Trust"), have sued John Hancock Mutual Life Insurance Company ("Hancock") for breach of contract, breach of fiduciary duty, negligence and unjust enrichment. Trustees' Complaint seeks both damages and an equitable accounting.

Trustees now move under Fed.R.Civ.P. ("Rule") 56 for summary judgment on their claims of breach of contract and breach of fiduciary duty. For the reasons stated in this memorandum opinion and order, Trustees' motion is granted in part and denied in part.

### Facts [1]

■ Wapensky is a citizen of Texas, Hillman and Golobic are California citizens,

---

1. Rule 56 principles impose on the movant the burden of establishing the lack of a genuine

Sieler is a citizen of Oklahoma and Wells is an Ohio citizen.[2] They are Trustees for BPAA Trust, which provides among its services group insurance to its approximately 1500 members through policies issued by a licensed insurance carrier. Hancock is a Massachusetts corporation with its principal place of business in Boston. Among other services, Hancock engages in financial services such as the underwriting and administration of insurance plans.

In August 1975 Trustees[3] and Hancock entered into a written agreement ("First Agreement") under which Hancock agreed to perform certain services related to the administration of the Trust. On December 28, 1983 Trustees and Hancock terminated the First Agreement and executed another agreement ("Second Agreement") under which Hancock again agreed to perform essentially the same services.

Among the services Hancock agreed to perform under both Agreements (First Agreement § 2(d) and Second Agreement § I.G[4]) was to:

> prepare and send billings to participating member establishments indicating the Trust contribution amounts due for each employee and or member. . . .

Hancock did in fact calculate the amounts of the monthly billings to BPAA members, send out those billings and collect the resulting monthly payments from BPAA members.

Included in the amount billed to members was the insurance premium (which was paid to the insurance carrier[5] to cover the cost of insurance) and the trust load contribution (the "Load," which covered the other costs of administering the program). In each instance the amount of the Load that was added to the bills of a member depended on the number of lives insured in its bowling establishment and the type of insurance coverage offered.

Throughout the course of the Trust's administration, Hancock (as per First Agreement § 2(h) and Second Agreement § V.(b)) sent Trustees a monthly "consolidated statement showing the amount of premium due the Insurer" and also reflecting Hancock's administrative fee. At all times Trustees paid the premiums and Hancock's administrative fee in accordance with Hancock's monthly figures. Additionally (as called for in First Agreement § 5(a) and Second Agreement § V.(a)) Hancock deposited and transferred funds to the Trust's bank account.

issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant (*Bank Leumi Le-Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir. 1991) and cases cited there). This District Court's General Rule ("GR") 12(m) and 12(n) requires factual statements in support of and in opposition to Rule 56 motions, and both sides have tendered such statements (respectively cited "P. 12(m) ¶ —" and "D. 12(n) ¶ —)."

2. Trustees' Complaint ¶ 2 identified only the Trust's citizenship, not that of the individual Trustees. Although Hancock's Answer ¶ 1 said in response that it admitted this Court's jurisdiction based on diversity of citizenship, that admission cannot do the job where the relevant facts before the court do not support the existence of the necessary diversity (see generally the discussion in *Market Street Associates Limited Partnership v. Frey,* 941 F.2d 588, 588–90 (7th Cir.1991). To establish diversity under 28 U.S.C. 1332(a)(1) in this type of case, it is the

citizenship of each Trustee that matters, not that of the Trust (*Navarro Savings Ass'n v. Lee,* 446 U.S. 458, 462–65, 100 S.Ct. 1779, 1782–84, 64 L.Ed.2d 425 (1980)). Accordingly this Court has required the parties to supplement the initial pleadings with the relevant information by stipulation, and the text reflects that added input.

3. Both agreements were executed by Wapensky on behalf of the Trust. For convenience this opinion will refer to the actions of the Trust as that of Trustees, the named plaintiffs here.

4. This Court's review of the Second Agreement discloses no internal evidence of the appropriate way to cite to subparts of the Articles designated by roman numerals. Simply for convenience, this opinion employs the same "§" designation that the First Agreement clearly specified.

5. Initially Hancock itself was the insurance carrier. Later (beginning about the time of the Second Agreement) the insurance coverage was written by another carrier, but Hancock remained as the administrator under the Agreements.

When the Second Agreement was terminated on August 1, 1988, the BPAA Trust account did not contain enough money to cover the premium payments for July 1988. In an attempt to determine why there were insufficient funds for that purpose, Trustees met with Hancock on August 24, 1989. At that time Hancock advised Trustees (1) that Hancock had never collected 2.2% of the amounts billed to participants and (2) that throughout the term of the Second Agreement Hancock had charged as its administrative fee 93% of the Load billed to members, rather than that percentage of the Load received.

Hancock's fee was to be determined on a different basis under the two Agreements. According to First Agreement § 4 (emphasis added):

> Hancock shall be paid for the performance of administrative services under this agreement an amount equal to: 3.2% of the premium amount *billed* member firms each month.

Second Agreement Art. III (emphasis added) changed that to an arrangement under which:

> Hancock/Dikewood shall be paid for the performance of services under this Agreement an amount equal to: 93% of the total trust contribution load *received* from the participating member establishments each month.

Hancock calculated its own administrative fee throughout the time that the Agreements were in force. And there is no evidence showing that Trustees were aware that under the Second Agreement Hancock continued to determine its fee based on the monthly amount billed—in direct violation of the contract.

As contrasted with the uncontroverted proof of Hancock's violation of its obligation to calculate and retain its own fees, Trustees have not established a right to summary judgment as to Hancock's nonperformance of its administrative duties. There is no uncontradicted evidence showing that Hancock failed either to "endeavor to collect" any amounts due from members, or properly to terminate accounts, or otherwise to maintain or provide reports or other administrative material, such as "necessary controls, validation steps and audit trails."

P.Mem. 19 and 20–23 present a final issue centering on Hancock's calculation of the Trust's "spendable income," which was reflected on the statements that Hancock supplied Trustees (at their request) beginning in February 1979. Since that time Trustees have set aside funds for spendable income in accordance with the monthly figures that Hancock provided and have drawn those funds to compensate BPAA for the marketing and administrative services it provided for the Trust. It is unquestioned that Trustees requested the inclusion of the spendable income figure on the monthly statements: In January 1979 Wapensky (relaying the request through broker Charles Goetz ("Goetz")) asked Hancock to do so.

There is considerable disagreement, however, as to how the spendable income figure was to be calculated. Hancock contends that Goetz provided the following formula for calculating "spendable income" to Katherine Farmer ("Farmer"), who was then Hancock's analyst handling the Trust account (Farmer Aff. ¶¶ 1, 4–5):

Trust Contribution Load [*]
+ 25% surcharges [*]
+ 5% surcharges [*]

= Total Trust Income
− Hancock administrative fee

= "Spendable Income"

[*] In each instance the starred figure was calculated on the basis of the amount billed to the participating establishments for the month involved. Under the group insurance program the 25% surcharge was imposed on non-BPAA members who participated in the group, while the 5% was a late charge for premium payments more than 31 days late.

Farmer says Goetz gave her that format over the telephone and also sent it to her in writing, although she says the written document was apparently discarded at some point (Farmer Aff. ¶ 4). She also acknowledges that she knew that the purpose of the calculation was to give Trustees a "rough idea" of how much money they

could spend (Farmer Dep. 77). But Goetz says he gave Farmer only the "format"—not the manner in which it should be calculated (Goetz Dep. 50). He also testified as to the purpose of the figure (Goetz Dep. 73):

Q What did you intend it [the spendable income report] to be?

A I intended it to be a way for headquarters to be able to determine how much spendable income there was each month.

Q Exactly how much was available each month?

A To the penny.

In any event, the spendable income calculation that appeared on each monthly statement did not describe the calculation, nor did it indicate whether it was derived from the Load as billed or as received.

### Claims Now at Issue [6]

Trustees move for summary judgment on two of their claims:

1. Count I, which contends that Hancock breached:

(a) the Second Agreement by calculating its fee as a percentage of the premium *billed* to participating firms each month, rather than as a percentage of the amount "received" from those billings; and

(b) both the First and Second Agreements by failing to provide the necessary controls, validations steps and audit trails.

2. Count II, which asserts (Complaint ¶ 28):

John Hancock breached its fiduciary duty to the BPAA Trust when it administered the BPAA Trust's group insurance program in a manner which

---

**6.** BPAA did not move for summary judgment on Count III (sounding in negligence) or Count IV (sounding in unjust enrichment), so neither will be addressed here.

**7.** Both parties' memoranda refer to Massachusetts law, as specified in Second Agreement Art. XVIII:

This Agreement shall be construed in accordance with and governed by the laws of the Commonwealth of Massachusetts.

created a final shortage of approximately $152,914.00.

Trustees ask for an accounting, damages, costs, expenses and fees. Each claim will be addressed in turn.[7]

### Breach of Contract

Hancock plainly had a number of obligations delineated in its contracts with Trustees. It does not challenge the existence and validity of those contractual arrangements. Instead it argues that:

1. the allegation regarding its taking more than its contractual share of the Load must fail because Trustees have waived the right to make or are estopped from making such a claim (D.Mem. 4–6); and

2. the claim that it failed to "provide the necessary controls, validations steps and audit trails" is not established by the facts (D.Mem. 11–14).

Hancock's Administrative Fee

■ Second Agreement Art. III (emphasis added) is unambiguous in stating that Hancock's administrative fee was to equal:

93% of the total trust contribution load *received* from the participating member establishments each month.

It is also crystal clear that Hancock did not comply with the Second Agreement: It billed Trustees for fees that were based on 93% of the Load *billed* and not *received*. Hancock admits as much but asserts the affirmative defenses of waiver and estoppel.

In support of its waiver claim, Hancock states (D.Mem. 4):

It is a well-settled principle of law that a party to a contract can waive the other party's strict compliance with the provi-

---

*Wood v. Mid–Valley Inc.*, 942 F.2d 425, 427 (7th Cir.1991) states:

Courts do not worry about conflict of laws unless the parties disagree on which state's law applies.

Without any "worry," this Court too will apply Massachusetts law.

sions of a written contract. *Cueroni v. Coburnville Garage, Inc.*, [315 Mass. 135], 52 N.E.2d 16[, 18] (Mass.1943).

Hancock then suggests that Trustees waived the provision in the contract that gives Hancock 93% of the total received. Just how that clause is said to have been transmuted into a provision allowing Hancock 93% of the total billed is left unclear. But in any case Hancock has failed to offer *any* proof that Trustees actually waived that part of the agreement or that they agreed to a change in Hancock's compensation level.

Hancock's basic flaw stems from its failure to offer evidence on the essential element of waiver: voluntary consent of the waiving party. As 3A Arthur Corbin, *Contracts* § 752, at 482 (1960) explains:

> [I]t appears that "waiver" consists of the voluntary action of the obligor alone.

*Cueroni*, 52 N.E.2d at 18—the very case cited by Hancock—provides a clear example of the element of "consent." There the court upheld a finding of waiver when the "defendant consented to the deviations in the contract" and on one occasion "personally request[ed]" that the plaintiff deviate from the contract by performing extra work (*id.* at 19).

But despite the plain teaching of *Cueroni,* Hancock ignores the element of "consent" necessary to prove its waiver claim. To make its case, Hancock maintains instead that after it had arbitrarily billed and then received payments for 93% of the total billed, Trustees waived Hancock's modification of the terms of the contract (D.Mem. 4–5):

1. by acknowledging through Goetz that such was the case; and
2. by not complaining to Hancock even though Trustees could see from the monthly statement that Hancock was taking more than its contractual share.

Neither of those "proofs" bears any mark of voluntary consent. First, Goetz had no authority (either apparent or real) to change the terms of the contract, and Hancock neither alleges nor offers any facts suggesting that Goetz had such authority to waive conditions in the Second Agreement. On the contrary, all the facts point the other way. Although Goetz was a broker between Trustees and Hancock, his broker's fee was paid by Hancock and he also received compensation from the insurance carrier—but *not* from BPAA—and he had no role in the formation of the contract (Goetz Dep. 30, 35).[8] Second Agreement Art. XVII further attests to Goetz's lack of express authority to change the terms of the Agreement:

> No alteration or modification of this Agreement shall be valid unless in each instance a written memorandum specifically expressing such a waiver, alteration or modification be made and subscribed by a duly authorized officer of Hancock/Dikewood and Trustee of BPAA Trust.[9]

Goetz is not a Trustee, and no other fact even hints at his having any authority to alter the terms of the Second Agreement. In short, Goetz could not have waived any contract provisions on behalf of Trustees because he was not authorized to do so.

■ As for Hancock's second theory of Trustees' consent, the monthly statements

---

**8.** Goetz states that his job was to market the life and health insurance program to member establishments of the BPAA (Goetz Dep. 18).

**9.** [Footnote by this Court] That clause of course evidences the authority of certain parties to modify or waive the terms of the agreement, while negating the authority of anyone else to do so. But despite its unequivocal nature, it does not necessarily foreclose the parties' right to modify the requirement of a writing by their later oral agreement. For example, *M.J.G. Properties, Inc. v. Hurley,* 27 Mass.App.Ct. 250, 537 N.E.2d 165, 167 (1989) (dealing with a lease) states:

> [W]e think the proper approach, and one which is in accord with our cases, is to look at the question of waiver as a question of fact in light of all the circumstances, including the existence of the antiwaiver clause.

See also 3A Corbin, *Contracts* § 763, at 531:

> Parties to a contract can not, even by an express provision in that contract, deprive themselves of the power to alter or vary or discharge it by subsequent agreement. An express provision in a written contract that no rescission or variation shall be valid unless it too is in writing is ineffective to invalidate a subsequent oral agreement to the contrary.

simply do not show on their face that Hancock was taking 93% of the *billed* rather than the *received* Load. For example, the August 1, 1986 statement from Hancock to Trustees shows that the word "billed" appears only once on the statement, where it states the amount billed to the members. But the word "billed" does not appear in conjunction with Hancock's administrative fee (Ex. 2 to D.Ex.C). Thus although the statement does show the total amount billed to BPAA members, neither the Load figure (from which Hancock's administrative fee was purportedly calculated) nor the administrative fee figure itself indicates whether the calculations are based on billed or received amounts. Moreover, the statement in no way indicates that the amount billed would be different from the amount received. It simply lists:

| | |
|---|---|
| Trust Load: | $____ |
| 25% Surcharge: | $____ |
| 5% Surcharge: | $____ |
| TOTAL TRUST INCOME: | $____ |
| Less Administration Fee: | $____ |
| Spendable Income: | $____ |

Nothing there even hints that the administrative fee was not being calculated pursuant to the unambiguous terms of the contract in force during the statement period.

Hancock asserts, however, that Trustees had to have known from *August 1981* that Hancock was calculating its fee as a percentage of the Load billed instead of received (D.Mem. 4). Not to put too fine a point on it, that is simply a lie. It was not until after the Second Agreement was in effect (*after December 1983*) that Hancock was first entitled to bill its fee as a percentage of the Load. Under First Agreement § 4, Hancock's fee was expressly based on a percentage of the billings to the members (at that time, based on total premiums rather than the Load alone). It cannot be said that the spendable income calculation—which was added to the statement in 1979 (D.Mem. 16)—can be used to show how the administrative fee was calculated, because that figure and its accompanying format

did not change over the period even though the manner in which the administrative fee was calculated did change.[10] Additionally, as is apparent for example from the January 1986 statement (Ex. 2 to D.Ex.C.), the statement itself does not indicate that the administrative fee is 93% of any other figure reflected there.[11]

In short, Trustees' mere acts of receiving (and presumably reading) the monthly bills and paying the amounts indicated do not constitute an intentional relinquishment of a known right. As waiver requires some kind of voluntary action by the obligor—and Trustees have exhibited none—waiver is not applicable here.

■ Hancock next contends that Trustees are estopped from challenging the amount of the fee they paid to Hancock because:

> [Trustees'] failure to question the manner of fee calculation over a period of 8 years clearly misled JOHN HANCOCK into believing there was no problem.

On that score *O'Blenes v. Zoning Board of Appeals of Lynn*, 397 Mass. 555, 492 N.E.2d 354, 356 (1986), quoting *Boston & Albany R.R. v. Reardon*, 226 Mass. 286, 115 N.E. 408, 411 (1917), states the test:

> Furthermore, "[i]n order to work an estoppel it must appear that one has been induced by the conduct of another to do something different from what otherwise would have been done and which has resulted to his harm and that the other knew or had reasonable cause to know that such consequence might follow." The reliance of the party seeking the benefit of estoppel must have been reasonable.

Thus Trustees cannot be estopped unless:

1. they "knew or had reasonable cause to know" that their actions would induce Hancock to perform under terms not found in the contract; and

---

10. This is true whether Hancock's or Trustees' version of the facts is accepted.

11. That anomaly might be due to the fact that Hancock added a "fixed charge for telephone expenses" to its fee (Farmer Aff. ¶ 7). That expense *is not itemized on the bill*, nor is it clear where Hancock purported to gain any authority to bill Trustees for such an amount.

2. Hancock reasonably relied on those actions.

Accord, *Riley v. Presnell,* 409 Mass. 239, 565 N.E.2d 780, 787 (1991).

In those terms Hancock's argument fails for several reasons. Little discussion is needed to reject any such notion of estoppel, which really rests on an excess of gall rather than any legal foundation.

First, as already discussed on the related component of the waiver argument, Hancock's monthly statements did not inform Trustees that the administrative fee was based on the amounts billed rather than the amounts received. And second, there is no evidence that Goetz told Trustees of Hancock's arbitrary change in calculating its own fee. Hence Trustees did not know, and they had no reasonable cause to know, that "harm" might result to Hancock by Trustees' payment of the amounts listed on the statements.

But the most damning evidence against Hancock's estoppel theory is the fact that *it knew* that it was taking a higher fee—by its own self-help and in its own self-interest—than was authorized under the express terms of the Second Agreement. *Thibbitts v. Crowley,* 405 Mass. 222, 539 N.E.2d 1035, 1040 (1989) quotes *Schiller v. Metropolitan Life Ins. Co.,* 295 Mass. 169, 3 N.E.2d 384, 387 (1936):

> A party who has knowledge of the facts cannot rely upon estoppel because he has not been misled to his harm.

Hancock unquestionably knew all too well that its compensation under the Second Agreement was to be figured on amounts *received* rather than *billed.* It can scarcely claim that it was misled to its detriment. Indeed, because *it* initiated the contract-violative conduct, its claim reduces itself to the absurdity that Hancock allegedly misled itself.

In summary, Trustees have not waived Hancock's contractual fee arrangement, nor are they estopped from asserting their claim that Hancock breached the administrative fee provision of the Second Agreement. And because neither of Hancock's defenses against Trustees' breach of contract claim is supported by any facts, Trustees are granted summary judgment as to liability on that claim.

Other Alleged Breaches

■ Next Trustees claim (P.Mem. 19) that Hancock failed to collect $649,214.38 of the amounts billed to BPAA members and also failed to inform Trustees of that failure. But neither of the Agreements guarantees the 100% collection of amounts billed to BPAA member establishments. Second Agreement § I.H. states only that Hancock shall "endeavor to collect" BPAA member contributions. And so Hancock's admission that it failed to collect certain amounts billed does not by itself constitute a breach of contract. Given the paucity of evidence as to whether Hancock failed to "endeavor to collect" any funds, that claim cannot be resolved on the current motion for summary judgment.

■ Trustees also say (P.Mem. 19) that Hancock failed to collect 40% of all surcharges. Second Agreement Art. XV states:

> Hancock/Dikewood agrees that all BPAA Trust contributions and non-member and late payment surcharges collected by it on behalf of or for the BPAA Trust ... shall be promptly deposited in an uncommingled bank account established and maintained by the Trust.

That paragraph, which speaks only in terms of what Hancock must do *if* it collects any surcharges, might not by itself create a duty to bill or to collect them. But any reading limited in that fashion would be unduly cramped, for such a duty may clearly be implied. It is plain that those surcharges are necessarily included in the "billings" in Second Agreement § I.G. and are among the "contributions" in Second Agreement § I.H. that Hancock was obligated to "endeavor to collect." Moreover, Hancock's own actions support such a construction: Farmer Dep. 26–27 states that she did collect surcharges from the members.

But even on the premise that Hancock had such an obligation, there are still unresolved factual issues. Farmer Dep. 26–27 and 182 go on to state that she either

always collected these surcharges or that they were waived.[12] As the evidence stands, it is not clear whether there were any unwaived surcharges and, if so, whether Hancock failed to endeavor to collect them.

■ Trustees also claim that Hancock breached its contract by failing to terminate delinquent insurance participants within 50 days, thus causing overpayments of premiums and fees.[13] While Hancock clearly had a contractual obligation in that respect (First Agreement § 2(f); Second Agreement § I.H), it is not certain whether any damages actually resulted to Trustees from Hancock's alleged failures to terminate delinquent members within 50 days. Hancock claims it had systems in place to prevent overcharges of premiums and fees (D.Mem. 9, citing record references). And until Trustees prove that a breach occurred in that respect, the issue also continues to involve material issues of fact that prevent a resolution at this time.

■ Another breach of contract allegation relates to Hancock's alleged failures to provide Trustees with a monthly listing of accounts due and unpaid, to keep a monthly list of overdue payments from the billing program and to provide necessary validation steps and audit trails. P.Mem. 11 relies heavily on Farmer's deposition testimony to support its allegations that Hancock failed to perform those accounting

and audit functions. But D.Mem. 11–14 also rely on Farmer's deposition testimony to rebut Trustees' contentions. Once again there are not enough undisputed facts to prove a breach of contract.

Spendable Income

■ Trustees' final breach of contract claim is that Hancock inaccurately reported spendable income on the monthly statements. There, however, the problem is to identify just what contractual promise was broken by that conduct. Neither the First nor the Second Agreement expressly requires Hancock to provide a spendable income figure to Trustees. Both parties agree that Hancock began to do so in response to a request by Trustees, not because of any specific covenant in either Agreement.[14] Hancock does not dispute that Trustees gave instructions that Hancock begin providing the figures. But it insists that it complied "gratuitously and extra-contractually" (D.Mem. 17).

Though that may take Hancock out of the area of conventional contractual liability, the fact that it responded to Trustees' request by giving data upon which they relied to their detriment might still make Hancock liable for the resulting damages.[15] Trustees relied on those figures in disbursing funds to BPAA, apparently paying out more money than was actually in the Trust account.

12. In that last respect the evidence is confusing at best. For example, Trustees say that such waivers could not be made by Goetz, yet they admit that one waiver was granted (P.R.Mem. 9; Wapensky Aff. ¶ 2). Goetz Aff. ¶ 2 states, "Trustees waived the surcharge on only a few occasions." Farmer Tr. 182 characterized such waivers as "very rare."

13. Every participant had to deposit an extra month's premium up front when it first came into the group plan. In that way Trustees were intended to be protected against delinquencies in later premium payments by the participants while the corresponding premiums were still due to the insurance carrier. That cushion would of course disappear if delinquencies were not policed promptly—hence the 50-day termination requirement.

14. At least in straight breach of contract terms, that should be the end of the matter under the

present pleadings. Trustees' Complaint advances only claims under the First and Second Agreements as attached. *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir.1989), citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984), teaches:

> It is a basic principle that the complaint may not be amended by the briefs....

Just so, Trustees cannot amend their Complaint here by their brief.

15. *Chedd–Angier Production Co. v. Omni Publications Int'l, Ltd.*, 756 F.2d 930, 936 (1st Cir. 1985), quoting *Loranger Construction Corp. v. E.F. Hauserman Co.*, 376 Mass. 757, 384 N.E.2d 176, 179 (1978), explains:

> Massachusetts has recently endorsed the theory of promissory estoppel, although it has chosen not to adopt the doctrine by name. In fact, Massachusetts has chosen to call such an agreement a contract where reliance makes it enforceable (*id.*).

As before, however, a factual issue bars summary judgment—this time the question whether the spendable income figures that Hancock provided were actually calculated according to a BPAA-supplied formula rather than on Hancock's own. On the one hand, Trustees insist that they wanted figures based upon the Load *received* and that they relayed their request to Hancock via Goetz. But Hancock insists that Goetz asked it to provide data based upon the Load *billed*. That certainly poses a genuine dispute as to whether Goetz relayed the proper instructions to Hancock about what Trustees wanted on the statement and how they wanted it to be calculated.

It must be said that the Hancock version strains credulity—after all, there is no question that the statements indicate "spendable income," which surely suggests an amount available to be *spent*. It seems quite bizarre that Farmer would calculate a figure that she admittedly knew was meant to give Trustees "a rough idea" of how much money they could spend (Farmer Dep. 77), and to do so in a way that did nothing of the sort.

### Breach of Fiduciary Duties

 Trustees couple their claims of breach of contract with a set of corresponding claims of breach of fiduciary duty. And in that area, of course, the starting point for analysis is to determine whether a fiduciary relationship existed.

Nothing in either Agreement declares that Hancock is a fiduciary. Instead, the only paragraph that mentions the word "fiduciary" states (Second Agreement Art. XII):

> For purposes of ERISA, Hancock/Dikewood is not the Plan Administrator or a Named Fiduciary nor shall Hancock/Dikewood be held out as such.

That does not end the matter. Because the term "fiduciary" in ERISA is much more expansive than the equitable (non-statutory) term, it is still possible that Hancock could be a "fiduciary" vis-a-vis Trustees under the terms of the Second Agreement.

 But Massachusetts law appears to reject that possibility, at least as it would embrace the totality of the relationship between the parties. Hancock, citing *Superior Glass Co. v. First Bristol County Nat'l Bank*, 380 Mass. 829, 406 N.E.2d 672, 674 (1980), states (D.Mem. 19, 21) that under Massachusetts law the relationship between it and Trustees:

> was nothing more than a straight-forward business relationship between contracting entities, it was not a fiduciary relationship.

As *Broomfield v. Kosow*, 349 Mass. 749, 212 N.E.2d 556, 560 (1965) explains:

> A reading of [Massachusetts] cases, however, will indicate that they stand for the principle that the plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature.

Although the "exact limits of the term 'fiduciary relation' are difficult to ascertain," one of the hallmarks of such a relationship is the reposing of "confidence" in another party to perform certain tasks (*id.* 212 N.E.2d at 560–61) and the other party's acceptance of that responsibility. Among the factors a court may review in determining the existence of a fiduciary relationship are (*id.* at 560):

> the relation of the parties prior to the incidents complained of, the plaintiff's business capacity or lack of it contrasted with that of the defendant, and the readiness of the plaintiff to follow the defendant's guidance in complicated transactions wherein the defendant has specialized knowledge.

 In short, Massachusetts generally does not call an arm's-length business relationship a fiduciary one.[16] From the face of the Second Agreement it is apparent that, at least in terms of the types of matters most frequently sought to be brought under the rubric of fiduciary duties, Hancock and Trustees had such an arm's-length relationship. Hancock undertook to provide Trustees with administrative support for its insurance needs. Noth-

---

**16.** That approach is a familiar one to Illinois practitioners as well.

ing in the contract hints at Trustees placing confidence in Hancock's expert judgment to make discretionary decisions or to give advice (see *Markell v. Sidney B. Pfeiffer Foundation, Inc.*, 9 Mass.App.Ct. 412, 402 N.E.2d 76, 95 (1980)). Instead, the First and Second Agreements delineated the exact tasks that Hancock was obligated to perform. While a failure to perform those tasks in conformance with the terms of the Agreements could amount to breach of contract, such failure does not amount to a breach of fiduciary duty when no such duty existed.

▆ P.Mem. 17 suggests that because Trustees contracted with Hancock, which was "expert[ ] in administering group insurance programs," and because Trustees paid the bills as reflected on the monthly statements, Hancock was in a fiduciary relationship with Trustees. Such a leap of logic confuses the kind of good faith that is required in every contract and the fiduciary duty that is found only in certain circumstances. *Market Street Associates*, 941 F.2d at 593 discusses the distinction between fiduciary duty and the contractual duty of good faith required in all contracts:

> The particular confusion to which the vaguely moralistic overtones of "good faith" give rise is the belief that every contract establishes a fiduciary relationship.

*Market Street Associates, id.* at 593–94 explains that such a belief is quite mistaken and that:

[I]t is unlikely that Wisconsin [Massachusetts here] wishes, in the name of good faith, to make every contract signatory his brother's keeper.... [E]ven after you have signed a contract, you are not obliged to become an altruist toward the other party....

Under Massachusetts law Hancock cannot be placed in a fiduciary relationship simply because it administered a billing system for BPAA's insurance program.[17]

▆ Trustees offer an alternative argument that Hancock is a fiduciary in its capacity as an agent. To that end they cite *Frontier Management Co. v. Balboa Ins. Co.*, 658 F.Supp. 987, 990 (D.Mass.1986):

> The mere fact that [an insurance company and an insurance management company] were sophisticated parties involved in a business relationship does not preclude the existence of a fiduciary relationship between them. While an arms length business relationship generally will not give rise to fiduciary duties, if one of the parties is an agent of the other, the agent will be a fiduciary with respect to all matters within the scope of his agency.[18]

But Trustees miss the whole point of agency law. Agency, which is by definition a fiduciary relationship (see Restatement (Second) of Agency § 1(1) and Comment 1(b) (1958)), triggers a set of principles that define the effect of the agent's dealings with *third* parties. And the agent's responsibilities with respect to those third parties may potentially create fiduciary

---

17. *Broomfield*, 212 N.E.2d at 561 is instructive here by way of contrast. There the defendant took advantage of the plaintiff's lack of knowledge to overcharge him for a construction project. Defendant's intent was to take the difference for himself. Defendant had promised an accounting but never gave one. Here the Agreements gave Trustees equal access to the records of the administration of the accounts, and nothing suggests the kind of relationship evidenced in *Broomfield*—at least if Hancock fully performed its contractual obligations of making that access wholly meaningful. If Hancock's overcharging created a fiduciary relationship even though both parties had ready and effectively equivalent access to the underlying information upon which the bills were based, then every case in which a business overcharged a client for an account would create a fiduciary

relationship. This is simply not the kind of circumstance described in *Broomfield*.

18. *Frontier Management* did not at all parallel the situation here—there (*id.*):

> [Defendant] had full control over the management of the insurance program. [Plaintiff] alleges that [defendant] made underwriting and rate setting decisions, reported premiums written, risks undertaken, losses claimed and losses paid, and handled and administered claims. These allegations, if proven at trial, might be sufficient to establish that [defendant] acted as [plaintiff's] agent.

Hancock's merely administrative duties did not even come close to the kind of involvement by the defendant in *Frontier Management*.

rights and obligations as between the principal and agent, arising from the agent's duties (in this instance, for example, as to Hancock's duty to pay over and account for the moneys collected rather than pocketing them for itself). But the test of whether the relationship between principal and agent is a fiduciary one as such—that is, as to *everything* that the agent does—is no different from the one that this opinion has already resolved to Trustees' detriment.[19]

Again the fundamental question is whether Hancock is a fiduciary, not whether it is an agent. If and to the extent that it is not a fiduciary, then it is neither a fiduciary nor an agent. And the governing law for that determination is as expressed in *Broomfield,* which dictates a "No" answer to the question.

This situation parallels that in *John Morrell & Co. v. John Hancock Mutual Ins. Co.,* No. 85 C 9166, 1988 WL 58619, at * 6–7, 1988 U.S.Dist. LEXIS 5103, at * 18–21 (N.D.Ill. May 24, 1988), which held that under Massachusetts law Hancock had no fiduciary duty to a company with which it had contracted to provide "administrative services" for a "non-insured health benefits plan" (*id.* at * 1 1988 U.S.Dist. LEXIS, at * 1). Just so here: Hancock is not a fiduciary of Trustees in *all* of the things that it is obligated to do under the contract between the parties.[20].

Accordingly this Court has ruled against Trustees on an essential element of its Count II. That Count is dismissed as a matter of law.

**19.** Hancock suffers from the same analytical myopia, for it responds to Trustees' agency argument by stating (D.Mem. 21) that it is not an agent because it is an "independent contractor." That concept too has to do with whether the party fitting that description (rather than coming under the label of "agent") can create legal consequences for the principal by conduct that affects third parties.

**20.** In an important sense the decision on this slice of the case is impacted by the remedies to which this Court finds Trustees entitled under that contract. If those remedies did not assure Trustees a fully informative and honest accounting, that would reflect the vesting of greater confidence in Hancock, as to which the law could well impose such a duty—and that could fairly be labeled as a "fiduciary" duty.

## Remedies

Trustees ask this Court to award damages in the amount of $152,914—the amount that their outside auditor found was the shortfall in the BPAA Trust account when the Second Agreement was terminated. At this point, however, the only claim that has been finally resolved in Trustees' favor is that Hancock overcharged for its services, and the exact damages for that claim can be proved by subtracting 93% of the Load received from the actual amounts paid by Trustees to Hancock. But it would certainly seem that amount is not likely to be as great as the entire shortfall. Hancock's remaining liability, if any, and the measure of any additional damages remain issues for the future.

Trustees have also asked for an accounting. They cite to *Ball v. Harrison,* 314 Mass. 390, 50 N.E.2d 31, 32 (1943) (emphasis added), which states this "repeatedly affirmed" principle:

[I]n order to maintain a bill in equity for an accounting, it must appear from the specific allegations that there was a fiduciary relation between the parties *or* that the account is so complicated that it cannot be conveniently be taken in an action at law....

Because one of those alternative predicates—a wholly fiduciary relationship—does not exist, Trustees are not entitled to an equitable accounting under the fiduciary theory as such.[21]

**21.** Hancock suggests that equitable accounting is available *only* if there is a fiduciary relationship. It relies on *Chedd–Angier Production,* 756 F.2d at 937:

Under Massachusetts law, an equitable accounting is available only if there exists a fiduciary or trust relationship between the parties ...

But that statement cannot be taken at face value, for the only theory alleged in *Chedd* was that there *was* a fiduciary relationship. As its source of law *Chedd* cited *Ball,* 50 N.E.2d at 32, which (as quoted above in the text) plainly states that there are *two* theories under which an accounting may be available. And it must always be remembered that state law is defined by the state courts, and not by the federal courts in diversity cases. In this instance the second

As for the second *Ball* alternative, an accounting to settle a complicated account that cannot be "conveniently or expeditiously investigated at common law," that concept might well apply in the future if the remedy discussed in the rest of this opinion were to prove less than fully effective (*Ryan*, 80 N.E.2d at 739).[22] For the present, though, it appears that Trustees are contractually entitled to all the information necessary to prove their claims. To that end it is useful to review (and, where necessary, to construe) those contractual rights.

Under First Agreement §§ 7 and 8 and Second Agreement Arts. VII and IX (the latter entitled "Audit Procedure") Trustees have the right both to audit the records of Hancock's administration and to have all such records turned over to them. Under Second Agreement Art. VII (entitled "Records") Hancock is required to maintain, and on termination of the Agreement to turn over to Trustees, such records as:

> copies of computer files, cards and records, including but not limited to hard copy or tapes of current insureds, payment status, as well as member correspondence files....

Those records would necessarily include all the reports listed in Second Agreement Art. II and records of "controls, validation steps and audit trails" (*id.* § I.N.). From those records—if indeed kept as the Agreement required—it should be possible for Trustees to verify (1) the amount of overcharges that Hancock received for its fee, (2) any surcharges that were due but were either not billed or not received and (3) any other amounts that were billed but not received. But that is not the whole story—

it is also necessary to take a look at what is necessary to make that an *effective* right.

Hancock claims (D.Mem. 23) that it has already "fully complied" with the requirements of the Second Agreement. But if that were indeed the case, there would have been no occasion for Trustees to be asking this Court now for the remedy of an accounting. Instead the root of the problem appears to be that the information given to Trustees is not really adequate. Trustees say (P.R.Mem. 14)—and nothing from Hancock has suggested otherwise—that many of the records that were turned over are "computer printouts, with codes understandable only to Hancock." It seems that in response to a discovery request Hancock made available "20 boxes of documents," most of which were "in the form of voluminous coded computer documents" (Teresa Verges ["Verges"] Aff. ¶¶ 3 and 4).

Under Second Agreement Art. VII Hancock is obligated to:

> hold and possess as its property all pages, books, files, correspondence, documentation for the computer system, computer program tapes and files, and records of all kinds....

It would defeat the very purpose of the Agreement if those records to be turned over or made available to Trustees upon an audit were not readable in a form that would allow Trustees to understand the information that Hancock was *required* to hold as "records" (*id.*), "controls, validation steps and audit trails" (*id.* § I.N.) and "Reports Available to Trustees" (*id.* Art. II). Trustees or their representatives can hardly perform an "audit"—which Webster's Third New International Dictionary 143

---

theory, an accounting to settle a complicated account, was upheld and employed in *Ryan v. McManus*, 323 Mass. 221, 80 N.E.2d 737, 739 (1948).

**22.** *Ryan*'s reasoning for allowing a Court to award an accounting to a party is broader than the basis approved in *Dairy Queen v. Wood*, 369 U.S. 469, 478, 82 S.Ct. 894, 900, 8 L.Ed.2d 44 (1962). *Dairy Queen* examined whether data would be too complicated for a jury, so as to require an accounting. Its reasoning also depends on the narrow use of masters allowed under Rule 53(b). By contrast, *Ryan* looked at

both the inherent power of courts to order an accounting and the statutory power (then Mass. Ann.Stat. ch. 214, § 3(6)) of state courts over:

> Suits upon accounts of such a nature that they cannot be conveniently and properly adjusted and settled in an action at law.

This Court need not now address the question whether the narrower treatment of *Dairy Queen* is based solely on the limited authority of federal courts to appoint masters. In any event it appears that if an audit proves unmanageable in this case, there may be a final alternative available in equity.

(1976) calls "a formal or official examination and verification of books of account"—if the information made available to them to that end is in unreadable code!

In short, the only reasonable reading of Hancock's contract obligation to give Trustees access to the records is to require it to do so in such form as can lead to a true audit of Hancock's performance under the Agreements.[23] That, however, is not the end of the story. In the context of this case—in which much of the data in its present form was incorrectly calculated because of Hancock's improper billing of its own fee—it cannot be a fair measure of its contractual undertaking for it to offer mere access to the records instead (as it apparently did, Verges Aff. ¶ 4) and leave it to Trustees to ferret out the truth from the undigested records.

This is after all a production-of-documents issue. As such, Rule 33(c)—which deals with responses to interrogatories that reflect information from a party's business records—provides a useful analogy. It must be remembered that Hancock's obligation to produce documents is preceded by its obligation to provide regular (and accurate) financial reporting. Rule 33(c) allows a party to respond to an interrogatory by simply making the raw documentary material available *only* where "the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as for the party served." No lesser standard is called for of Hancock here, given its distorted performance of the Agreements up to now.

It just cannot be said that Trustees are in an equal position with Hancock to discover facts from the records alone under the circumstances. To place the parties back on a level playing field so that Hancock's production of underlying records and Trustees' contractual right to audit them are meaningful, Hancock must first recalculate all the statements and, if not already accurately prepared, must also create all the reports and auditing trails required under the Agreements. And because Hancock is required to have possession of the "audit trails" and the computer programs that store and manipulate the data,[24] the parties clearly contemplated in the Agreements that Hancock had the burden to maintain the information in such an order that an audit can be performed.

It is certain that Hancock made some fundamental errors in its record preparation and maintenance (for example, when it overbilled for its fee). It must therefore conduct a new accounting in order to turn over accurate information to Trustees. In the context of Hancock's improperly prepared statements over a period of years, Trustees cannot otherwise have an effective way in which to analyze the information available in its present form.

In sum, Trustees are of course entitled to the records from the accounts held by Hancock. But the only proper interpretation of the parties' contracts (see n. 23) is that Hancock must first reconstruct the data and present it in such a way that Trustees can audit the account—it must perform what amounts to a *proper* accounting. Furthermore, Hancock must label and arrange the data in its accounting and must present the underlying data to Trustees in a manner such that an auditor can determine what happened over the period.[25] Only then will the parties be placed in the

**23.** As *ITT Corp. v. LTX Corp.,* 732 F.Supp. 1225, 1239 (D.Mass.1990) (brackets in original) explains:

> Under Massachusetts law, the proper interpretation of a contract "is the one which appears to be in accord with justice and common sense and the probable intention of the parties. It [interprets the Agreement] as a business transaction entered into by practical men to accomplish an honest and straightforward end.... [It recognizes that] [e]very contract implies good faith and fair dealing between the parties to it."

Hancock is, of course, bound by its own good-faith obligation to carry out the intention of the parties as expressed in the contract.

**24.** At least it was required to do so under Second Agreement Art. VII and § I.N.

**25.** For example, it may be necessary to provide Trustees with the computer program and some assistance in operating it to gain access to the code that it previously gave to Trustees. In our time, a computer program can be the Rosetta Stone to decipher computerized compilations of data.

necessary position of equal access to the information in the account.

It is of course possible that Trustees' conduct of a confirming audit will itself turn out to be too burdensome (just as Hancock's preceding work is likely to be). But neither party can now complain that either the accounting or the audit is burdensome. Hancock's long-term misbilling and Trustees' failure to take advantage of their contractual right to examine and verify the data regularly both contributed to the current state of affairs—though it is Hancock's actions that were wrongful. Surely Hancock can hardly complain that it now has to fulfil its obligation under the Agreements where its improper billing of its own administrative fee—a classic instance of self-dealing—has so greatly contributed to the need for such an audit.

### Conclusion

There is no genuine issue of material fact regarding the claim that Hancock overcharged Trustees for administrative fees. Hence Trustees are entitled to a judgment as to Hancock's liability on that claim as a matter of law. Summary judgment is not appropriate, however, on Trustees' other claims of breach of contract, because genuine issues of material fact remain as to each of them. Finally, Trustees' claims of breach of fiduciary duty are without basis, for Hancock was not a fiduciary here as to all its duties—at least in light of what it has undertaken in contractual terms. Accordingly Count II is dismissed.

Because Hancock is not a fiduciary of Trustees in all respects and because there presently appears to be an alternative remedy available to deal effectively with the complicated account here, Trustees' request for an equitable accounting is denied at this time. That may be a merely formal distinction, because Hancock is contractually obligated under the Agreements to provide Trustees or their representatives with

an accounting, in accessible form, that will provide answers to the following questions:

1. how much Hancock overcharged Trustees for its administrative fee;

2. how much Hancock failed to collect from the BPAA members;

3. whether Hancock ever failed to terminate a delinquent participant within 50 days; and

4. whether Hancock failed to collect surcharges from members (and relatedly whether any of such surcharges were waived).[26]

This action is set for a next status hearing at 8:45 a.m. October 2, 1991. At that time the parties are directed to present a plan to this Court outlining how the accounting will be accomplished and proposing a schedule for its completion. Trustees are further directed to be prepared to discuss how they plan to pursue their claim regarding the spendable income calculation (see n. 15).

---

**26.** Any damages to Trustees resulting from any loss attributed to Hancock's alleged misreporting of spendable income, if that claim is properly alleged and proved, can be calculated from the figures generated by the accounting and from the amounts (which are within Trustees' present knowledge) that they expended in reliance upon the misreporting.